**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 07-61038-CIV-MARRA**


VANTAGE VIEW, INC,

      Plaintiff,

vs.

QBE INSURANCE CORPORATION,

      Defendant,

_____/


**OMNIBUS
REPORT AND RECOMMENDATION**

     **THIS CAUSE** is before the Court on Plaintiff, Vantage View, Inc's ("Vantage View")

Motion for Attorney's Fees and to Tax Costs (D.E. #141) and Vantage View's Motion for

Bill of Costs (D.E. #142) . These matters were referred to the undersigned United States

Magistrate Judge by the Honorable Kenneth A. Marra, United States District Judge for the

Southern District of Florida. An evidentiary hearing on these matters took place before the

undersigned over the course of three non-consecutive days, January 13, 2010, February

16, 2010, and March 11, 2010. [1]

  After careful consideration of the pleadings filed, the evidence of record, the testimony

and evidence presented at the hearing and the relevant case law, the undersigned

respectfully recommends that Plaintiff's Motions be granted in accordance with the terms

hereof and that Vantage View be awarded $1,871,779.82 in attorney's fees ($153,980.00

---

[1] Transcripts of these proceedings have been prepared and shall be referred to
throughout this Report and Recommendation as 1/13/10 Tr., 2/16/10 Tr., or 3/11/10 Tr.,
respectively.

for the Garfinkel law firm, and $1,717,799.82 for the GT law firm (obtained by applying a 2.2 contingency fee mulitplier to GT's lodestar amount of $780,818.10)) and $81,665.45 in costs, for a total attorney's fee and cost award of $1,953,445.27.

## I. <u>BACKGROUND</u>

This case arose from damages caused to a condominium as a result of Hurricane Wilma and the ensuing dispute over insurance benefits.  Plaintiff, Vantage View, Inc., is the condominium association for the condominium that sustained the loss. Defendant, QBE Insurance Corporation, is the insurance company that provided insurance coverage for the subject condominium. After QBE denied coverage for the claim, Vantage View filed this action, initially in state court and subsequently removed to federal court, seeking damages for breach of the subject insurance policy. Vantage View was initially represented by the law firm of Katzman, Garfinkel, P.A. ("Garfinkel"), who, by mutual consent and the entry into a Joint Representation Agreement, was later substituted with the law firm of Greenberg, Traurig, P.A. ("GT").   After a 12 day trial, the jury found in favor of Vantage View, awarding it damages in the amount of $1,583,640. This award was subsequently reduced by the District Court by the amount of the deductible ($459,863.00) to $1,197,855.50.

By the instant Motions, which inasmuch as they seek the same relief shall be addressed as one, Vantage View seeks an award of attorney's fees and costs in the total amount of $2,714,473.00.  The attorney's fee portion of the award sought is $2,606,931. Of this amount $185,885.00 is sought for the work the Garfinkel Law Firm expended on the matter. The remainder of the amount sought is for the work performed by the Greenberg,

Traurig Law Firm and is calculated by taking the total amount of attorney's fees Vantage View incurred for Greenberg, Traurig's work on the case ($968,418.40) and applying to that amount, a contingency fee multiplier of 2.5 pursuant to Florida Patient's Compensation Fund v. Rowe, 472 So.2d 1145 (Fla. 1985), as modified by Standard Guar. Ins. Co. v. Quanstrom, 555 So.2d 828 (Fla. 1990). The cost portion of the award sought is $102,655.10 for taxable costs Plaintiff asserts were necessary to its prosecution of the case, and includes costs for photocopy charges, off-site printing and copying charges, deposition and trial transcripts, court reporter fees, service company charges, subpoenas, witness fees, the filing fee and the courtroom technology fees.

## II. **FINDINGS OF FACT**

This case was originally filed in state court on November 3, 2006 by Vantage View, a condominium association, against its insurer, QBE Insurance Corporation ("QBE"), seeking damages for breach of an insurance policy issued by QBE for damages caused to the condominium property by Hurricane Wilma on October 24, 2005. D.E. 1 (3/11/10 Tr. 35:18-20). QBE subsequently removed the action to federal court (1/13/10 Tr. 14:23-15:3) (D.E. 1).

Initially Vantage View retained Katzman Garfinkel, P.A. f/k/a the Garfinkel Trial Group ("Garfinkel") as its counsel pursuant to an October 12, 2006 written retainer agreement (Pltf. Ex. "2," ¶4) (Pltf. Ex. "8").[2] The fee agreement between Vantage View and

---

[2] At the fee hearing, the parties stipulated to the admissibility and authenticity of Plaintiff's exhibits 1 through 11 and that the numbers contained in those exhibits with respect to the numbers of hours billed, the hourly rates, the costs expended, etc. are part of the record and are not contested by QBE. QBE did not stipulate,

Garfinkel (the "Fee Agreement") is a pure contingency fee agreement which provides that Vantage View will pay Garfinkel a fee of 40% of the gross recovery after filing of a lawsuit, or amount of attorneys' fees awarded by the Court, whichever is greater. (Pltf. Ex. "8," p. 1).  At the hearing Mr. Chad Lucas, attorney for Garfinkel, testified that at the time Vantage retained Garfinkel to represent it, a contingency fee agreement was the only option available as the association had no funds to pay attorney's fees on an hourly rate  (1/13/10 Tr. 45:13-16).

In fact, at the time, the association did not even have enough money to conduct the necessary repairs to the property, so that in December, 2006, the association took out an SBA loan in the amount of One Million Dollars ($1,000,000.00) to obtain the funds required to repair some of the damage caused by Hurricane Wilma (1/13/10 Tr. 44:16-45:4).  After experiencing a shortfall, Vantage View subsequently attempted to obtain additional funds by way of a home equity line of credit from several banks, but was unsuccessful in this regard. Thus, Vantage View had no ability to borrow additional funds (1/13/10 Tr. 46:7-15). The SBA loan is still outstanding  (1/13/10 Tr. 45:5-12).

The Garfinkel/Vantage View Fee Agreement, in addition to setting forth the agreed upon fee arrangement, also specifically provided that: (a) Garfinkel would work with co-counsel; (b) Garfinkel would share its fee with such co-counsel; (c) the division of fees between Garfinkel and co-counsel would be dealt with in a separate agreement between the two law firms; and (d), in no event would Vantage View be responsible for paying two attorney's fees, or more than the amount provided for in its fee agreement with Garfinkel

---

however, to the reasonableness of the rates, the hours or the costs.  (1/13/10 Tr. 3:2-6:20).

(Pltf. Ex. "8," p. 1).

On April 3, 2008, Defendant, QBE filed a Motion for Leave to Amend its Answer and Affirmative Defenses to assert an affirmative defense of fraud, based on Vantage View's alleged intentional misrepresentation and exaggeration of its claim in its sworn proof of loss.  (D.E. 9). Thereafter, on May 9, 2008, Garfinkel and another law firm, Greenberg Traurig, P.A. ("GT") entered into a Joint Representation Agreement pursuant to which GT agreed to represent Vantage View in the above-referenced case.  (Pltf. Ex. "3," ¶12) (Pltf. Ex. "10").  GT and Garfinkel are in agreement that the Joint Representation Agreement they entered into provided that GT would be entitled to receive half of any attorneys fees awarded pursuant to the Fee Agreement. (1/13/10 Tr. 22:19-23:15; 68:2-14).  Upon the recommendation of Garfinkel, Vantage View agreed to permit a substitution of counsel to allow GT to represent it in this case under the same terms and conditions as those set forth in the Fee Agreement.  (1/13/10 Tr. 47:15-25; 48:7-17; 56:20-57:9; 90:21-91:11).

Up to this point the attorney's fees incurred were as a result of work performed by the Garfinkel Law Firm.  QBE argues that Vantage View should not be awarded any attorney's fees or a significantly reduced fee for the services performed by the  Garfinkel Law Firm. QBE's argument is based on the contention that Garfinkel attempted to falsely inflate Vantage View's insurance claim. Inasmuch as the jury itself found no evidence of fraud or even a concealment of a material fact, the Court finds QBE's request in this regard meritless.

The attorneys who performed the majority of the work undertaken by the Garfinkel Law Firm on the case were Chad Lucas, Alan Garfinkel,  James Dennis, and Keith

Lambdin.  According to the affidavit submitted, the rates billed by these attorneys for the case were in accordance with the standard rates billed by the firm at the time, and were as follows: Mr. Garfinkel at $400.00 per hour; Mr. Dennis at $400.00 per hour;  Mr. Lambdin at $400.00 per hour; and, Mr. Lucas at $375.00 per hour.  The paralegal assigned to the case, Ms. Sandy Culwell, billed out at her standard rate of $100.00 per hour. (Pltf. Ex. "2," ¶¶7, 9). The amount of hours billed by the Garfinkel lawyers and paralegals on the case is 563.50. (Pltf. Ex. "4," ¶26).       QBE's expert, Ms.Michaela Scheihing, takes issue with the hourly rate billed by these attorneys claiming the rates are excessive and not in accordance with the prevailing market rate in the community. See Affidavit of Michaela Scheihing (Def. Ex. "1," D.E. #149).  She also takes issue with some of the hours billed by the Garfinkel attorneys on the grounds the hours billed were excessive.  Id. For reasons more fully explained subsequently herein, the Court finds some of the hourly rates and time billed by the Garfinkel firm excessive, and in this regard reduces same accordingly.

As Garfinkel's active representation of Vantage View was coming to a close, GT's representation was just getting started. On June 13, 2008, GT filed a notice of appearance with the Court on behalf of Vantage View (Pltf. Ex. "3," ¶13), and on June 19, 2008, GT and Garfinkel entered into a Stipulation for Substitution of Counsel whereby GT became counsel of record for Vantage View. Id. (D.E. #'s 30 and 35).  At the time GT entered into the Joint Representation Agreement with Garfinkel on May 9, 2008, trial was scheduled to take place approximately four months later. Upon filing its formal Notice of Substitution of Counsel, GT immediately filed a motion for continuance, which was denied. This meant that to be prepared for trial, GT was required to perform a tremendous amount of work in

a compressed period of time.  (D.E. 6, 52) (1/13/10 Tr. 67:12-68:1) (2/16/10 Tr. 27:11-24).

The case involved highly complex and difficult issues including, but not limited to complex damages issues and issues arising from the policy exclusions and other defenses raised by QBE.   (2/16/10 Tr. 27:25-28:7).   During the compressed period of time allotted, the GT law firm conducted multiple inspections of the Vantage View property, interviewed numerous fact witnesses, hired, worked with and disclosed expert witnesses, submitted expert reports, took and defended 22 expert and fact witness depositions (some of which took place over more than one day), filed and defended numerous discovery motions, participated in mediation, defended a motion in limine, filed Vantage View's witness and exhibit lists, prepared a pretrial stipulation with appropriate objections to QBE's exhibits, prepared deposition designations, prepared jury instructions and otherwise fully prepared for trial on an expedited basis.

The trial itself was tried before a jury and was conducted for 12 days over a three week period. (Pltf. Ex. "3," ¶27). The trial consisted of the live testimony of 22 witnesses, including nine expert witnesses, and four unit owners who testified at trial by deposition, as well as the use of computer animated demonstrative exhibits to support expert testimony. Id.  Trial ended on September 26, 2008 with a verdict in Plaintiffs favor. Id.  After trial, GT participated in extensive briefing in connection with defending QBE's post trial motions and the issue of prejudgment interest. (Pltf. Ex. "3," ¶27) (1/13/10 Tr. 73:24-75:19). Id

The verdict rendered by the jury at trial determined that: (1) neither Vantage View nor its agents intentionally concealed or misrepresented a material fact regarding the claim;

(2) Vantage View did not refuse to comply with conditions precedent before filing the lawsuit;, and (3) QBE breached the insurance contract by failing to pay for covered loss or damages to Vantage View's property caused by Hurricane Wilma. (D.E. #119). The jury awarded Vantage View damages in the total amount of $1,538,640.00. Id. This verdict was subsequently reduced by the Court by the amount of the insurance policy's deductible to $1,078,777.00. (D.E. 128).

The GT attorneys who performed the majority of the legal work on behalf of Vantage View are Alan Dimond, Candace Duff, and Courtney Berman. According to the affidavit filed by Plaintiff, Mr. Dimond's standard hourly rate, as established by the firm during this engagement, was $625.00 per hour in 2008 and $650.00 per hour in 2009. Ms. Duff's hourly rate was $440.00 per hour in 2008 and $450.00 per hour in 2009 and Ms. Berman's hourly rate was $230.00 in 2008 and $245.00 in 2009. Two other attorneys at GT performed limited work on this case - Tim Kolaya, and Alex Nemiroff. Vantage View seeks compensation for these attorneys at their respective hourly rates of $230.00 for Mr. Kolaya and $290 for Mr. Nemiroff. (Pltf. Ex. "3," ¶15) (1/13/10 Tr. 68:25-69:11). According to the affidavit of Mr. Dimond, GT's lead trial counsel on the case, the changes in GT's hourly rates are attributable to the fact that, on January 1, 2009, GT increased the hourly rates charged for its attorneys and paralegals. Id. The hourly rate charged for the primary GT paralegal assigned to the case - Mr. Michael Alvarez - increased from $135.00 in 2008 to $145.00 in 2009. (Pltf. Ex. "3," ¶15). Vantage View also seeks to recover fees incurred by seven GT paralegals who worked on the case and billed anywhere from $85 to $185 per hour. The GT law firm billed a combined total of 2,946.09 hours for work performed by

its attorneys and paralegals.

QBE's expert, Ms.Michaela Scheihing, takes issue with the hourly rates billed by these attorneys, claiming the rates are excessive and not in accordance with the prevailing rates charged in the community. See Affidavit of Michaela Scheihing (Def. Ex. "1," D.E. #149). She also takes issue with some of the hours billed by the Garfinkel attorneys on the grounds the hours billed were excessive.   Id. For reasons more fully explained subsequently herein, the Court finds some of the hourly rates billed by the GT  firm excessive, and in this regard reduces same accordingly.

QBE argues and this Court agrees that the risk assumed by GT in taking this case on a contingency basis was substantial. (2/16/10 Tr. 23:7-25:25). Success was unlikely at the time GT accepted the case because of its unusual facts  which placed Vantage View's integrity as the core issue.  The second estimate of damages submitted by Vantage View, which formed the basis for the figure contained in the proof of loss it submitted to QBE, included numerous mistakes, such that a jury could have reasonably concluded that Vantage View's entire claim was fraudulently submitted.  (Pltf. Ex. "3," ¶30) (1/13/10 Tr. 78:8-81:10).  If the jury had determined that Vantage View's entire claim was fraudulently submitted, there would have been no recovery.

QBE hotly contested this case, not only in terms of its allegations involving fraud, but also in the assertion of its numerous other affirmative and other defenses that, if proven, would have resulted in a defense verdict, including, but not limited to: (1) failure to fulfill conditions precedent; (2) failure to comply with policy loss conditions including providing examinations under oath; (3) coverage exclusions and defenses; (4) that the

damages caused by non-covered causes such as "wear and tear, "decay" and "deterioration" in a building that was built in 1977; (5) that the damages were caused by an earlier hurricane (Katrina hit the building 30 days earlier) and thus, were not covered under the policy; (6) coverage limitations for interior damage; and (7) fraud.  Further, QBE challenged numerous repairs and replacements made of damaged property claiming same was unnecessary or building code required upgrades limited or not covered by the policy. If proven, the disallowance of those expenditures could have resulted in a defense verdict. (Pltf. Ex. "3," ¶31) (1/13/10 Tr. 86:1-8).

Taking the case on a pure contingency basis meant that GT was not able to mitigate the risk of nonpayment in the event of a defense verdict.   (1/13/10 Tr. 86:1-8) (2/16/10 Tr. 26:6-22).  According to the credible testimony from GT attorneys, GT understood the risks it was undertaking, and the weaknesses in the case prior to the time it agreed to represent Vantage View.  (1/13/10 Tr. 131:8-132:14; 134:5-135:2; 143:11-22).        GT understood that all of the above-mentioned  factors made the case less than desirable, and required the probability of obtaining a contingency fee multiplier to attract competent counsel to take the case based on the risks involved.  (Pltf. Ex. "3," ¶34) (1/13/10 Tr. 81:17-84:25) (2/16/10 Tr. 24:17-25:13).  The Court agrees that it is a reasonable assumption based on the undisputed facts presented  that no attorney with the skill necessary to obtain a favorable result for Vantage View would have been willing to accept this case on a contingency fee basis without the possibility of receiving a contingent fee multiplier.  (2/16/10 Tr. 40:9-25).

The case itself was fact intensive involving numerous and complex issues of law which required attorneys with the highest level of skill in terms of complex commercial

litigation to explain it to a jury, and to obtain a verdict on behalf of Vantage View. (2/16/10 Tr. 28:11-17). Working on the case consumed large amounts of time for the GT attorneys involved, for extended periods, which effectively precluded them from working on other matters. (Pltf. Ex. "3," ¶33) (1/13/10 Tr. 73:12-23; 86:9-22) (2/16/10 Tr. 42:11-21). Credible evidence was presented at he hearing on this matter that GT turned down other work to undertake the representation of Vantage View. (1/13/10 Tr. 138:14-17).

The experience, reputations and skills of the attorneys who represented Vantage View in this case, are undeniably excellent. Lead trial counsel for Vantage View, Alan Dimond, is widely considered to be one the of best trial lawyers in the South Florida community, and commands the utmost regard and respect from his colleagues. GT is a highly regarded law firm, not only in the South Florida community, but in the community of lawyers nationwide, and all of the attorneys who represented Vantage View in this matter are highly skilled, highly regarded lawyers who contributed substantially to the outcome of this case. (Pltf. Ex. "4," ¶24). The amount recovered by Vantage View - a verdict of $1,078,777.00, plus costs and prejudgment interest - is a significant recovery of money and under the circumstances and facts of this case, and the complexity of the damages issues and other defenses raised by QBE, was an excellent result. (Pltf. Ex. "4," ¶23).

On September 10, 2008, after the jury was seated, QBE made a verbal settlement offer to Vantage View in the amount of $2,000,000. (1/13/10 Tr. 94:1-5; 96:1-12). QBE's $2,000,000 settlement offer included not only the claims for damages asserted in this action, but also attorneys' fees, costs, prejudgment interest and any claim for bad faith that Vantage View could bring against QBE. (1/13/10 Tr. 142:2-13). This offer was rejected.

Id. As of September 10, 2008, Vantage View had already incurred at least $900,707.40 in attorneys fees - $185,885.00 for Garfinkel's time and $714,822.40 for GT's time. (Pltf. Exs. 9, 12, 13). As of September 10, 2008, Vantage View had incurred $74,364.59 in taxable costs. (Pltf. Exs. 11, 14 and 15). As of September 10, 2008, QBE owed Vantage View $59,495.29 in prejudgment interest. (Pltf. Ex. 12). To this day, QBE has not paid any monies to Vantage View. (3/11/10 Tr. 47:3-5). The minimum value of Vantage View's bad faith claim against QBE as of September 10, 2008 was $250,000. Added together, Vantage View's claims and damages as of September 10, 2008, totaled $2,363,344.28 and were comprised of the damages awarded by the jury ($1,078,777.00), "lodestar" attorneys' fees ($900,707.40) without consideration of a multiplier, prejudgment interest ($59,495.29), taxable costs ($74,364.59), and Vantage View's bad faith claim ($250,000.00). (Pltf. Exs. 9, 11, 12, 13, 14). Accordingly, the settlement offer made by QBE did not exceed the judgment obtained by Vantage View as that amount is calculated.

The Garfinkel and GT law firms claim to have spent a combined total of over $300,000 in costs, only $102,655.10 of which are purportedly taxable. (Pltf. Ex. "2," ¶11) (2/16/10 Tr. 41:7-11) (Pltf. Ex. 11) (1/13/10 Tr. 38:2-14)(Pltf. Ex. "4," ¶29) (Pltf. Ex. 11). By this Motion, Vantage View seeks a total cost award of $102,655.10 for taxable costs it claims were necessary to its prosecution of the case, and includes costs for photocopy charges, off-site printing and copying charges, deposition and trial transcripts, court reporter fees, service company charges, subpoenas, witness fees, the filing fee and courtroom technology fees.

During the three-day evidentiary hearing on attorney's fees and costs, testimony by

Plaintiff's expert, Gerald Richman, placed the value of the lodestar for Garfinkel's fees at $185,885.00 and the value of the lodestar for GT's fees at $968,418.40. (Pltff's Ex. 11, D.E. 141; D.E. 200, 87-88). Defendant's expert, Michaela Scheihing, placed the value of the lodestar for Garfinkel's fees at $101,627.50 and the value of the lodestar for GT's fees at $354,070.00 (D.E. 149, Ex. 2; Def. Ex. 2 at Evidentiary Hearing; D.E. 200, 87-88). Vantage view seeks application of a 2.5 multiplier (the highest allowable by law) to GT's attorney's fees, which it asserts is supported by the affidavit of Plaintiff's expert, Mr, Richman (Ex. 11, D.E. 141). Defendant vigorously opposes the application of any multiplier to GT's fees, which, in turn, it claims finds support in the affidavit of its expert, Ms. Scheihing (Ex. 1 D.E.149). The Court finds application of a 2.2 multiplier to GT's fees appropriate in this case. No multiplier has been sought to be added to the fees of the Garfinkel firm.

The Court finds the great majority of costs sought in Plaintiff's Motion to Tax Costs properly taxable in this case. Specifically, Vantage View is entitled to the bulk of $49,622.82 it incurred on outside copying services and in-house copy costs for the copying of documents that were reasonably necessary to assist the Court in reaching a conclusion as well as copies of documents obtained and produced in discovery. Vantage View is also entitled to an award of $30,832.83 for the costs it incurred for court reporter fees and transcripts that were necessarily obtained for use in the case. (Pltf. Ex. 15).

The following depositions were taken in this case: (1) Robert Sansone (twice); (2) Scott Hampton; (3) Jack Brown; (4) Chuck Pechuls; (5) Adam Locke; (6) Dan Lavrich; (7) John Wareham (on two dates); (8) Ed Morris, (9) Charles Higler; (10) Jose Euceda; (11)

Steve Young;  (12) James Foxworth;  (13) Joseph Forte;  (14) Joseph Giordano;   (15) Howard Crim;  (16) Harriet Studt;  (17) Amanda Wilhelm;  (18) Stanley Swaysland (twice); (19) Jutta Eshaya;  (20) Ivan Browner;  (21) Dave McDonald;  (22) Andy Kaplan;  (23) Frank Bennardo (twice);  (24) Paul Del Vecchio;  (25) Brian Oakes;  (26) Chris Malloy;  (27) Lee Branscome; and (28) Ken Romain (twice).  (Pltf. Ex. "3," ¶39).

The expenses incurred in connection with the taking and defending of the depositions and obtaining copies of the deposition transcripts were necessary to properly prepare for trial.  Vantage View used many of the deposition transcripts to determine the evidence Vantage View needed to present at trial, and in connection with the preparation of direct and cross examinations.  Vantage View made further use of the deposition transcripts by having certain witnesses testify at trial by deposition in lieu of live testimony. (Pltf. Ex. "3," ¶40).

The expense incurred in connection with obtaining the trial transcripts was also reasonably incurred and necessary.  Vantage View used the trial transcripts for purposes of determining what, if any, additional evidence needed to be presented at trial to prove its case and what testimony or evidence presented by QBE needed to be rebutted.  Vantage View also used the trial transcripts  in connection with responding to QBE's post-trial motions.  (Pltf. Ex. "3," ¶41). The copies of the hearing and trial transcripts GT obtained from another first party insurance case involving QBE styled <u>Chalfonte Condo. Apt. Association., Inc. v. QBE Ins. Corp.</u>, Case No. 06-81046-CIV-MIDDLEBROOKS were necessary for use in trial preparation for this case.   GT used those transcripts extensively to prepare for depositions of QBE's experts and corporate representative (which were the

same witnesses in both cases), and to prepare cross-examinations of those witnesses for use at trial.  (Pltf. Ex. 6, ¶9)  (1/13/10 Tr. 158:11-159:4).

Vantage View incurred $1,918.50 for filing fees and private process server which it is entitled to tax as costs.  (Pltf. Ex. 6, ¶7) (1/13/10 Tr. 158:1-10). Vantage View served subpoenas for deposition on: (1) QBE Insurance Corporation, Tom Gallagher; (2) Robert Sansone; (3) Jimerico Construction, Inc.'s Corporate Representative; (3) Adam Locke; (4) Chuck Pechuls; (5) Jack Brown; (6) Dan Lavrich; (7) Edward Morris c/o East Coast Windows & Doors; (8) East Coast Windows & Doors' Corporate Representative; (9) Jonathan Wareham; and (10) Wareham Construction, Inc.'s Corporate Representative. Plaintiff served trial subpoenas on: (1) Jose Euceda; (2) David McDonald; (3) Gunter Banak; (4) Chris Malloy; (5) Paul Del Vecchio; (6) Annette Schlubach Casacci; (7) Sharon Balkin; (8) Deborah Chmielarz; (9) Deborah L. Floyd; (10) Steven Rossen; (11) Dr. Anthony Previte; (12) Allen Smith; (13) Olga Sinitsina; (14) Barnes Hi-Tech Heating & Cooling's Corporate Representative; (15) Barbara Templin; (16) A-Z Carpeting's Corporate Representative; (17) Structural Group's Corporate Representative; (18) Ultimate Pool's Corporate Representative; (19) Premier Flooring's Corporate Representative; (20) Beautiful Concrete's Corporate Representative; (21) Andrew R. Kaplan; (22) Needham Roofing's Corporate Representative; (23) Stanley Swaysland; (24) Ivan Browner; (25) Frank Bennardo; (26) James Dismas; (27) Robert Levine; (28) Wallace Elliott; (29) Jennifer Porter; (30) Chuck Higler; (31) Daryle Wolf; (32) J. Finucane and/or E. Zerafa; (33) Gary Gershman; and (34) Lee Branscome.  (Pltf. Ex. "3," ¶42).

Vantage View spent a total of $2,040.75 on recoverable witness fees in this case.

Vantage View paid witness fees to the following persons in connection with the trial of this matter: Jennifer Porter, Daryle Wolf, Barbara Templin, Wallace Elliott, Gary Gershman, Robert Levine, J. Finucane and/or E. Zerafa, Olga Sinitsina, Beautiful Concrete, Moe Plumbing, Annette Casacci, Barnes Hi-Tech Heating & Cooling, Jose Euceda, James Dismas, Needham Roofing, Chuck Higler, Chris Malloy, David McDonald, Gunter Banak, A-Z Carpeting, Structural Group, Ultimate Pools, Inc., and Premier Flooring. Vantage View is entitled to recover these costs.  (Pltf. Ex. "3," ¶43). Vantage View also seeks to tax as costs, the $17,985.00 it paid for the use of a courtroom technologist - Mr. Nick DeMelas - at trial to assist with the presentation of both trial exhibits and computer animated demonstrative exhibits, and for the rental of the equipment that he used in the courtroom in connection with his work. Vantage View is not entitled to recover these costs.  (Pltf. Ex. "3," ¶44).

### III. <u>CONCLUSIONS OF LAW AND DISCUSSION</u>

#### A.  <u>ATTORNEY'S FEES</u>

By the instant motions Vantage View, as the prevailing party in the underlying breach of insurance contract action, is seeking an award of attorney's fees against QBE for fees and costs incurred as a result of securing the representation of the law firm Vantage View initially hired, Garfinkel, and the law firm brought in four months prior to trial pursuant to a Joint Representation Agreement, GT.   In support of the sought after relief, Vantage View relies on Fla. Stat. §627.428, which provides that an insured who obtains a judgment in its favor against its insurance company is entitled to recover its reasonable attorneys' fees incurred in connection with prosecuting the lawsuit:

> Upon the rendition of a judgment or decree by any of the courts of this state against an insurer and in favor of any named or omnibus insured or the named beneficiary under a policy or contract executed by the insurer, the trial court or, in the event of an appeal in which the insured or beneficiary prevails, the appellate court shall adjudge or decree against the insurer and in favor of the insured or beneficiary a reasonable sum as fees or compensation for the insured's or beneficiary's attorney prosecuting the suit in which the recovery is had.

Id.

Under the statute, the insured's entitlement to attorney's fees upon prevailing in a lawsuit against as insurance company, is automatic: "If the dispute is within the scope of section 627.428 and the insurer loses, the insurer is always obligated for attorney's fees." Ins. Co. of N. Amer. v. Lexow, 602 So. 2d 528, 531 (Fla. 1992). There is or can not be any reasonable dispute that Vantage View is entitled to recover its reasonable attorneys fees in this case. The question that remains is what is a "reasonable amount" under the circumstances?

Plaintiff seeks a total of $2,606,931.00 in attorney's fees. Of this amount $185,885.00 is sought for the work that the Garfinkel Law Firm expended on the matter and the remainder of the amount sought is for the work performed by the Greenberg, Traurig Law Firm (GT). GT's number was arrived at by taking the total amount of attorney's fees Vantage View incurred for GT's work on the case, namely $968,418.40, and applying to that amount, a contingency fee multiplier of 2.5 pursuant to Florida Patient's Compensation Fund v. Rowe, 472 So.2d 1145, 1151 (Fla. 1985), as modified by Standard Guar. Ins. Co. v. Quanstrom, 555 So.2d 828, 834 (Fla. 1990). Where, as here, the case is before the court on diversity, the award of attorney's fees is governed by applicable state

17

law.  Perkins State Bank v. Connolly, 632 F.2d 1306 (5th Cir. 1980); FIGA v. R.V.M.P. Corp., 681 F. Supp. 806, 807 (S.D. Fla. 1988).   Accordingly, in determining a reasonable attorney's fee in the instant case, the court is required to apply the framework set forth in Rowe and its progeny.

In Rowe, the Florida Supreme Court adopted the federal lodestar approach as a starting point in reasonable fee determinations.[3]  Thus, under Rowe, a reasonable attorney's fee is determined by multiplying the number of hours reasonably expended on the litigation by the reasonable hourly rate. Id. at 1150;  Hensley v. Eckerhart, 461 U.S. 424 (1983); Popham v. Kennesaw, 820 F.2d 1570, 1578 (11th Cir. 1987).  The resulting figure, known as the "lodestar," may thereafter be enhanced or reduced based on the results obtained or the risk of nonpayment.[4]  Quanstrom, 555 So.2d at 834.  In other words, once

---

[3] In arriving at the "lodestar," the court may consider a variety of factors.  In Rowe, the Florida Supreme Court adopted the factors set forth in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-719 (5th Cir. 1974) which, for its part, utilized the criteria enunciated in former Disciplinary Rule 2-106(b) of the Florida Bar Code of Professional Responsibility.  These factors are now found under Rule 4-1.5(b)(1) of the Rules Regulating the Florida Bar and are as follows: (1) the time and labor required; (2) the novelty and difficulty of the question; (3) the skill requisite to perform the legal services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional responsibility with the client; and, (12) awards in similar cases. Johnson, 488 F.2d at 717-719.

[4] This language was clarified in the case of Alvarado v. Cessarino, 706 So.2d 380 (Fla. 2d DCA 1998), wherein the 2d DCA observed that "in the context of a contingency fee case, we believe that a more precise interpretation of this language as applied to contingency fee cases is that once the court arrives at the lodestar figure, it may add to the fee based upon a contingency risk factor or subtract from the fee based upon the results obtained." Id. at 381.  As explained in Rowe "[t]he 'results obtained' may provide an independent basis for reducing the fee when the party prevails on a claim or claims for relief, but is unsuccessful on other related claims." 472 So.2d at 1151.

the court arrives at the lodestar figure, it has the discretion to add to the fee by applying a contingency risk factor, or "multiplier," or subtract from the fee based upon the results obtained. <u>Rowe</u>, 472 So. 2d at 1151; <u>Alvarado</u>, 706 So.2d at 381.

Before arriving at a lodestar and discussing the propriety of applying a multiplier as Plaintiff requests, the Court begins by addressing several of QBE's defenses to Vantage View's claim. First, as a defense to Vantage View's claim for attorneys fees for GT's work, QBE argues that the Joint Representation Agreement between GT and Garfinkel is unenforceable because Vantage View is not a signatory to the agreement and thus, the agreement is in violation of Rule 4-1.5 of the Rules Regulating the Florida Bar ("Rule 4-1.5"). QBE further contends that GT cannot enforce the contingency agreement between Vantage View and Garfinkel even though Vantage View specifically agreed to be represented by GT pursuant to that agreement because GT is not a signatory to it in violation of Rule 4-1.5. For the following reasons, this Court rejects QBE's arguments and specifically finds that GT's Fee Agreement Complies with Rule 4-1.5 of the Rules Regulating The Florida Bar.

Rule 4-1.5(g) provides that a division of fees between lawyers who are not in the same firm may be made only if the total fee is reasonable and the division is in proportion to the services performed by each lawyer or, by written agreement with the client. Rule 4-1.5(f)(2) provides, in pertinent part, that:

> Every lawyer who ... enters into an agreement, express or implied for compensation for services rendered or to be rendered in any action, claim or proceeding whereby the lawyer's compensation is to be dependent or contingent in whole or in part upon the successful prosecution or settlement thereof shall do so only where such fee arrangement is

reduced to a written contract, signed by the client, and by the
lawyer or for the law firm representing the client. ...

Rule 4-1.5 is intended to protect the client.  It is not intended to shield the non-prevailing party from the payment of attorney's fees.  Corvette Shop & Supplies, Inc. v. Coggins, 779 So.2d 529, 531 (Fla. 2d DCA 2000).  The Joint Representation Agreement and the Garfinkel Fee Agreement may be read together to comprise the written agreement for contingency fees required by the Rules regulating the Florida Bar. Safelite Glass Corp v. Samuel, 771 So.2d 44, 46 (Fla. 4th DCA 2000), *abrogation recognized on other grounds*, Graham v. Peter K. Yeskel 1996 Irrevocable Trust, 928 So.2d 371 (Fla. 4th DCA 2006). When read together, the two agreements comprise a valid written agreement for contingency fees between GT and Vantage View. Safelite, 771 So.2d  at 46.

The cases cited by QBE, Foodtown Inc. of Jacksonville v. Argonaut Ins. Co., 102 F.3d 483 (11th Cir. 1996) and Harbaugh v. Greslin, 365 F.Supp.2d 1274 (S.D. Fla. 2005) are distinguishable.  In Foodtown, the plaintiff sought to enforce an oral amendment to an existing written fee agreement between it and its counsel that would have changed the attorney's fees recoverable under the agreement from a fixed percentage of the plaintiff's recovery to the greater of either the fixed percentage or whatever the court awarded.  102 F.3d at 484.  The trial court refused to recognize the oral change to the agreement and limited the fee recovery to the fixed percentage set forth in the written agreement.  The 11th Circuit  affirmed the trial court's ruling on grounds that the written agreement was clear and enforceable and complied fully with the rule governing fee agreements.  102 F.2d at 485.

20

The facts of the Harbaugh case are virtually identical to those in Foodtown. Once again, a plaintiff sought to enforce an oral modification of an existing fee agreement between it and its counsel to change the agreement from a fixed percentage of the recovery to the greater of the fixed percentage or the amount awarded by the court. Relying on Foodtown, the court enforced the written agreement. 365 F.Supp.2d at 1278.

Both the Foodtown and Harbaugh cases are distinguishable from the instant case for the same reason, Here, Vantage View does not seek to enforce an oral modification of an existing written fee agreement between it and GT. Instead, it seeks to have the Court read two written agreements (the Joint Representation Agreement and the Fee Agreement) together to constitute an enforceable written contingency fee agreement between Vantage View and GT. There is no other written fee agreement between GT and Vantage View for the Court to enforce. It also does not escape notice that in both Foodtown and Harbaugh, the court's decision to enforce the written agreement inured to the client's benefit. Here, there is no benefit that would be derived from the client were this Court to declare the contingency fee agreement between GT and Vantage View unenforceable.

Second, QBE contends, without authority, that Vantage View should not be awarded any attorney's fees or be awarded a significantly reduced attorney's fees for the services performed by the  Garfinkel Law Firm based on a "belief that Garfinkel, working under a contingency contract, attempted to falsely inflate Plaintiff's insurance claim, thereby necessitating the further litigation of this matter." See Def's Resp., p.9  (D.E. 149).  As Plaintiff correctly observes, QBE fails to provide a shred of evidence in support of its "belief" or cite a single case in which a court refused to award attorney's fees to an insured

on this basis.  Moreover, QBE's contention is totally negated by the jury's specific finding in the verdict that neither Vantage View nor its agents intentionally concealed or misrepresented a material fact regarding this claim. (D.E. 119).  Accordingly, the Court rejects QBE's request to refuse to award or to strictly limit the amount of attorney's fees awarded to Garfinkel based on QBE's unfounded and in fact disproved "belief" of fraud.


Now to the business of determining the reasonable amount of attorney's fees Vantage View is entitled to for the work performed by both the Garfinkel and GT law firms. Once again, under Rowe and its progeny, a reasonable attorney's fee is determined by multiplying the number of hours reasonably expended on the litigation by the reasonable hourly rate. Id. 472 So.2d at 1150.  The resulting figure, known as the "lodestar," may thereafter be enhanced or reduced based on the results obtained or the risk of nonpayment.  Quanstrom, 555 So.2d at 834.

The undersigned begins by determining a reasonable hourly rate for the services rendered.  The burden is on the moving party to establish the prevailing market rate, which is the rate charged in the community by lawyers of reasonably comparable skill, experience and reputation for similar services. Blum v. Stenson, 465 U.S. 886, 895-96 (1984); NAACP v. City of Evergreen, 812 F.2d 1332, 1338 (11th Cir. 1987); Gaines v. Dougherty Co. Bd. of Education, 775 F.2d 1565, 1571 (11th Cir. 1985). "The decision regarding the appropriate hourly rate may be made either by analyzing the affidavits submitted by counsel or, if this documentation is insufficient, by relying upon the court's expertise." Avirgan v. Hull, 705 F.Supp. 1544, 1549 (S.D. Fla. 1989).  Satisfactory evidence of the

22

market rate requires more than the mere affidavit of the attorney performing the work. Blum, 465 U.S. at 896.  Also, testimony that a given fee is reasonable is insufficient; evidence must be of rates actually billed and paid.   Hensley, 461 U.S. at 439.  Such evidence may be adduced from charges of lawyers under similar circumstances or by opinion evidence.  Norman v. Housing Authority of City of Montgomery, 836 F.2d 1292, 1299 (11th Cir. 1988).

When analyzing the market rates being attested to, the court may consider any of the applicable twelve factors enumerated in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714,717-19 (5th Cir. 1974). [5]  One of those factors, the hourly rate normally charged by the applicant's counsel, has been deemed the logical starting place in any rate determination.  Vaughns v. Board of Education, 598 F.Supp. 1262 (D.Md. 1984), aff'd, 770 F.2d 1245 (4th Cir. 1985); Zeffiro v. First Pennsylvania Bank, N.A., 574 F.Supp. 443, 447 (E.D.Pa. 1983), aff'd without opinion, 746 F.2d 1469 (3rd Cir. 1984).  See also Florida Pawnbrokers and Second Hand Dealers Ass'n, Inc. v. City of Fort Lauderdale, 711 F.Supp. 1084, 1086-87 (S.D. Fla. 1989).  Also considered probative are the rates billed in similar lawsuits and the relative skill of the attorneys involved.  Norman, 836 F.2d at 1299.

The attorneys who performed the majority of the work undertaken by the Garfinkel Law Firm on the case were Chad Lucas, Alan Garfinkel,  James Dennis, and Keith Lambdin.  According to the affidavit submitted, the rates billed by these attorneys for the case were in accordance with the standard rates billed by the firm at the time, and were as follows: Mr. Garfinkel at $400.00 per hour; Mr. Dennis at $400.00 per hour;  Mr. Lambdin at $400.00 per hour; and, Mr. Lucas at $375.00 per hour.  (Pltf. Ex. "2," ¶¶7, 9)

[5]   The twelve factors enumerated in Johnson are set forth *supra.,* at n.3.

The paralegal assigned to the case, Ms. Sandy Culwell, billed out at her standard rate of $100.00 per hour. Id.

Upon review of each of the Garfinkel attorney's credentials, years of practice, level of education, experience and reputation, the Court agrees with QBE that the hourly rates sought by the Garfinkel attorneys are excessive, but finds QBE's suggested rates as stated in the affidavit of QBE expert, Ms. Michaela Scheihing (Def. Ex. "1," D.E. #149), unreasonably low. After considered review and calling upon the Court's own expertise, as is permitted, the undersigned finds the prevailing market rate as applied to each of the Garfinkel attorneys who worked on the case to be as follows: $275 per hour for 10 year associate Chad Lucas; $350 per hour for 20 year attorneys Alan Garfinkel and Keith Lambdin; and $400 per hour for 30 year attorney James Dennis. These rates were determined not only by virtue of the number of years these attorneys have been in practice, but also on the basis of these attorneys level of education, skill, expertise in the area, and reputation in the community for similar services. The paralegal rate of $100 per hour for Sandy Culwell, as acknowledged by QBE expert Michaela Scheihing, is reasonable and well in line with the rates charged by other similarly situated paralegals in the South Florida community (Def. Ex. "1," D.E. #149).

The GT attorneys who performed the majority of the legal work on behalf of Vantage View are Alan Dimond, Candace Duff, and Courtney Berman. According to the affidavit filed by Plaintiff, Mr. Dimond's standard hourly rate, as established by the firm during this engagement, was $625.00 per hour in 2008 and $650.00 per hour in 2009. Ms. Duff's hourly rate was $440.00 per hour in 2008 and $450.00 per hour in 2009 and Ms. Berman's

hourly rate was $230.00 in 2008 and $245.00 in 2009.  Two other attorneys at GT performed limited work on this case - Tim Kolaya, and Alex Nemiroff.  Vantage View seeks compensation for these attorneys at their respective hourly rates of $230.00 for Mr. Kolaya and $290 for Mr. Nemiroff. (Pltf Ex. "3," ¶15) (1/13/10 Tr. 68:25-69:11).  According to Mr. Dimond, GT's lead trial  counsel on the case, the changes in GT's hourly rates are attributable to the fact that, on January 1, 2009, GT increased the hourly rates charged for its attorneys and paralegals.(Pltff's. Ex. "3," ¶15). The hourly rate charged for the primary GT paralegal assigned to the case - Mr. Michael Alvarez - increased from $135.00 in 2008 to $145.00 in 2009. Id.

Upon review of each of the GT attorney's credentials, years of practice, level of education, experience and reputation, the Court agrees with QBE that the hourly rates sought by the GT attorneys are excessive, but as in the case of Garfinkel, finds QBE's suggested rates for GT's attorneys as stated in the affidavit of QBE expert, Michaela Scheihing (Def. Ex. "1," D.E. #149), unreasonably low and not illustrative of the market rate, which is the rate charged in the community by lawyers of reasonably comparable skill, experience and reputation for similar services. Blum, 465 U.S. 886, 895-96 (1984). After considered review and applying the Court's own expertise, as is permitted, the undersigned finds the prevailing market rate as applied to each of the GT attorneys who worked on the case to be as follows: $500 per hour for 40 year attorney and principal shareholder Alan Dimond[6]; $350 per hour for 18 year attorney and shareholder Candace Duff; $175 per hour

---

[6]  The Court notes that in addition to Mr. Dimond's 40 years of trial experience, he is "a past President of The Florida Bar and is widely considered to be one of the best and most highly respected lawyers in the community in the subject areas of real estate and commercial litigation. He has won numerous awards, including but not limited to: (1) Best Lawyers in America, 2007-2009, (2) Super Lawyers Magazine, 2006, 2007 and

for new associate (admitted to the Florida Bar approximately 4 months before the trial) Courtney Berman; $175 for new associate (admitted to the Florida Bar two days after the trial in this case)[7] Tim Kolaya; and $250 for 5 year associate Alex Nimroff.   These rates were determined not only by virtue of the number of years these attorneys have been in practice, but also on the basis of these attorneys' level of education, skill, expertise in the area, and reputation in the community for similar services.

In it's Response to Plaintiff's Motion, QBE cites to <u>Chalfonte Condominium Apartment Ass'n v. QBE Insurance Corp</u>, Case No. 06-81046-CIV-MIDDLEBROOKS and argues the court in that case "set a top rate of $300 per hour for the lead shareholder in a first-party hurricane case venued in the Southern District." Def's Resp., p.7 (D.E. 149). As Plaintiff correctly observes, state courts in South florida have held much higher hourly rates to be reasonable in first party insurance cases. <u>See Trumbull Ins. Co. v. Wolentarski</u>, 2 So.3d 1050, 1054-56 (Fla. 3d DCA 2009)(not disturbing a trial court's finding that an hourly rate of $450 an hour was reasonable for an insured's attorney's services, but

---

2008, and (3) "Top Lawyer," South Florida Legal Guide, 2005." Affidavit of Gerald Richman, attached as Ex. 11 to Pltff's Mtn., p.9 (D.E. #141).

[7] The Court disagrees with the testimony of Defendant's expert, Ms. Scheihing, that because Mr. Kolaya was not admitted to the Florida Bar until September 28, 2008, two days after the trial, his work should be billed as a law clerk rather than as an attorney. <u>See</u> Def. Ex. "1," n.1, D.E. #149.   It is not unusual for law firms, particularly large law firms such as GT, to hire associates directly out of law school and before they have completed the Bar. These new associates whose Bar results are pending or who have not yet obtained clearance are typically paid the same average starting salary as any other new associate and billed out at the same starting associate hourly rate.  It is only in this way that GT would be able to obtain the commitment from graduating law students of Mr. Kolaya's caliber, who are highly sought after upon their graduation from law school.  The work performed by Mr. Kolaya, who was employed as an associate at the GT law firm and was billed by GT at the starting associate hourly rate, should be billed at an attorney's rate, and not, as Ms. Scheihing suggests, at the rate of a law clerk, simply because he had not then been admitted to the Florida Bar.

reversing the award based on the attorney's failure to keep time records or present any reconstruction of the time spent on the claim).

Moreover, courts in this district have awarded hourly rates in excess of $300 an hour for lead counsel in comparable types of civil cases. See,e.g., Edmunds v. Levine, 2009 WL 1012193, *5 (S.D. Fla. 2009)(finding a rate of $400 an hour for lead counsel and $375 an hour for co-counsel reasonable in a medicaid coverage case for legal services performed in 2005-2006). See also Control Systemation, Inc. v. Controlled Semiconductor, Inc., 2008 WL 540701, *1 (M.D. Fla. 2008)(finding a rate of $400 per hour reasonable for lead counsel in a commercial litigation case). Finally, the Court notes that the award in Chalfonte, was for attorney's fees incurred in 2007, a full three years ago, so that the $300 rate is somewhat out-of-date.

Vantage View also seeks to recover fees incurred by seven GT paralegals who worked on the case and billed anywhere from $85 to $185 per hour. Defendant's contention that reasonable market rates in the South Florida community for paralegals range anywhere between $85-$100 and that recovery over this $100 mark may not be had, is rejected. See Affidavit of Michaela Scheihing (Def. Ex. "1," D.E. #149).  GT is an international law firm employing nearly 2,000 attorneys in 30 different locations around the World.  Support staff at these large firms, and in complex, document intensive cases such as this one, is often indispensable, and like anything else, does not come cheap. Paralegals were particularly important in this case, where the GT firm had only four months to get prepared for trial.  While the "average" market rate of a paralegal may indeed be the $100 claimed, for large, international firms of the caliber of GT, a $100 billing rate for a

paralegal, especially a senior paralegal with a BA Degree like Ms. Castillo, is simply too low. (2/16/10 Tr. 20:16-21:2) (Pltf. Ex. "4," ¶21).

Notwithstanding the foregoing, the Court finds the paralegal hourly rates sought by Vantage View for work performed by the GT paralegals in this case is excessive. Based upon this Court's knowledge and expertise in the area, gleaned from over 20 years on the bench and a familiarity with attorney fee petitions and paralegal hourly rates in the community, the Court finds the following hourly rates reasonable and in accord with the paralegal rates charged in the community for paralegals of comparable skill, experience and reputation for similar services: $140 for Ms. Castillo; $130 for Mr. Astorga, Mr. Alvarez and Ms. Lazopoulos; $90 for Mssrs. Birenbaum and Frias; and, $85 for Ms. Roa.

The next step in the analysis of the lodestar is the ascertainment of the amount of "reasonable hours." "Excessive, redundant, or otherwise unnecessary" hours should be excluded from the amount claimed.   Hensley, 461 U.S. at 434.   In addressing reasonableness of hours, the Rowe court found:

> To accurately assess the labor involved, the attorney fee applicant should present records detailing the amount of work performed. Counsel is expected, of course, to claim only those hours that he could properly bill to his client. Inadequate documentation may result in a reduction in the number of hours claimed, as will a claim for hours that the court finds to be excessive or unnecessary.

472 So.2d at 1150.  These excluded hours are those which are unreasonable to bill to a client "irrespective of the skill, reputation or experience of counsel."  Norman, 836 F.2d at 1301.  Generalized statements that the time spent was reasonable or unreasonable, are not particularly helpful and are entitled to little weight.  Hensley, 461 U.S. at 439.  "The

general subject matter of the time expenditures ought to be set out with sufficient particularity so that the district court can assess the time claimed for each activity." Norman, 836 F.2d at 1303.  Furthermore, "as the district court must be reasonably precise in excluding hours thought to be unreasonable or unnecessary, so should the objections and proof from fee opponents."  Norman, 836 F.2d at 1301.

Beginning with the Garfinkel law firm, the amount of hours billed by them for work performed by their attorneys and paralegals is a combined total of 563.50.  (Pltf. Ex. "4," ¶26).  The amount of hours incurred is reflected in the detailed billing statements attached to the Motion as Ex.2 (D.E. #141).   Considering the limited time period the Garfinkel attorneys and paralegals had available to get ready for trial, the numerous issues involved and the complex nature of the case, the Court finds that with the exception of 7 hours billed by attorney Chad Lucas and referred to in the expert affidavit of Michaela Scheihing (Def. Ex. "1," D.E. #149)[8], the hours claimed to have been incurred by the Garfinkel Law Firm are credible and reasonable under the circumstances. The Garfinkel law firm initiated the lawsuit, took or defended 5 depositions, produced and reviewed over 7700 pages of

---

[8]  The following hours are deemed excessive and have been reduced accordingly: the 18 hours billed by Lucas preparing for the deposition of Scott Hampton has been reduced by three hours to 15 hours; the 3.3 and 3.2 hours billed by Lucas for "receipt and review" of the deposition transcripts of Robert Sansone and Scott Hampton, respectively, have been reduced by one hour each to 2.3 and 2.2 hours, respectively; and the 14.4 hours billed by Lucas to "review and analyze" the exhibits to Mr. Sansone's deposition has been reduced by two ours to 12.4 hours. These reductions are in accordance with the suggestions made in the affidavit of Michaela Scheihing (Def. Ex. "1," D.E. #149).  Other reductions were suggested in Scheihing's affidavit, such as 8 hour blocks of time spent by Garfinkel paralegal Sandy Culwell, to "prepare and organize file for upcoming trial," Id. ,that the Court has considered and rejected, finding no basis to reduce these hours billed.  This takes Lucas' hours down from the 357.8 sought to seven hours less, or 350.8.

documents, defended 91 third party subpoenas for documents served by QBE, served 78 requests for copies of documents produced pursuant to those subpoenas, defended 174 subpoenas served by QBE upon each and every unit owner in the Vantage View Condominium, retained some of the expert witnesses who ultimately testified at trial on behalf of Vantage View, obtained discovery from QBE, defended against the taking of certain depositions and prepared the file for litigation.  (Pltf. Ex. "2," ¶5) (1/13/10 Tr., 18:17-21:1).

Based on the foregoing, the Court finds the 563.50 attorney and paralegal hours spent by Garfinkel on this case should be reduced by only 7 hours to 556.50 hours. This reduced amount of hours constitutes a reasonable amount of time for the services provided and applied to the revised hourly rates set forth above, results in an award of attorney's fees to the Garfinkel Law Firm in the amount of $153,980.

GT has billed a combined total of 2,946.09 hours for the work their attorneys and paralegals performed on the case.  (Pltf. Ex. 5, ¶25 and Ex. 7 of D.E. 141).  The amount of hours incurred is reflected in the detailed billing statements attached to the Motion as Ex.7 (D.E. #141). The case involved highly complex and difficult issues including, but not limited to complex damages issues and issues arising from the policy exclusions and other defenses raised by QBE.  (2/16/10 Tr. 27:25-28:7).  During the compressed period of time allotted, the GT law firm conducted multiple inspections of the Vantage View property, interviewed numerous fact witnesses, hired, worked with and disclosed expert witnesses, submitted expert reports, took and defended 22 expert and fact witness depositions (some of which took place over more than one day), filed and defended numerous discovery

motions, participated in mediation, defended a motion in limine, filed Vantage View's witness and exhibit lists, prepared a pretrial stipulation with appropriate objections to QBE's exhibits, prepared deposition designations, prepared jury instructions and otherwise fully prepared for trial on an expedited basis.

The trial itself was tried before a jury and was conducted for 12 days over a three week period. (Pltf. Ex. "3," ¶27).  The trial consisted of the live testimony of 22 witnesses, including nine expert witnesses, and four unit owners who testified at trial by deposition, as well as the use of computer animated demonstrative exhibits to support expert testimony. Id.  Trial ended on September 26, 2008 with a verdict in Plaintiffs favor. Id.  After trial, GT participated in extensive briefing in connection with defending QBE's post trial motions and the issue of prejudgment interest. (Pltf. Ex. "3," ¶27) (1/13/10 Tr. 73:24-75:19). Id.

QBE argues that some of the hours Plaintiff seeks to recover for work performed by GT paralegals and lawyers alike should be deducted from the amount awarded. Specifically, QBE, through its expert, Ms.Scheihing, takes issue with some of these hours arguing same to be duplicitive, excessive or otherwise secretarial in nature. See Affidavit of Michaela Scheihing (Def. Ex. "1," D.E. #149). Plaintiff's expert, Mr. Gerald Richman, claims the opposite to be the case and testifies in his affidavit that "there are no excessive, redundant, unreasonably duplicitive or otherwise unnecessary hours in Plaintiff's requested attorney's fees" with regard to "the work of [Garfinkle's and GT's] attorneys and paralegals in this action." See Affidavit of Gerald Richman (Pltff's Ex. "11," p.10, D.E.#141).  Upon careful review of the detailed billing records filed by GT, as well as the record in this case,

31

the testimony provided at the hearing and all evidence submitted, the Court finds no cause to deduct any hours of the attorney or paralegal time incurred and specifically finds none of these hours to be unreasonable, duplicitive, excessive or otherwise secretarial in nature as Defendant contends. Accordingly, taking the 2,946.09 amount of hours GT's attorneys and paralegals worked on the case and applying the appropriate portions of same to the respective attorney's and paralegal's hourly rate, results in a lodestar of $ 780,818.10.

The next issue concerns the propriety of enhancing the lodestar by adding a multiplier to GT's fees as Plaintiff requests. Under certain circumstances, the lodestar may be enhanced in order to reach a more appropriate attorney's fee. See Quanstrom, 555 So.2d at 834. When determining whether application of a multiplier is necessary or appropriate in a given case, the Florida Supreme Court has instructed the courts to consider the following enumerated factors: (1) whether the relevant market requires a contingency fee multiplier to obtain competent counsel; (2) whether the attorney was able to mitigate the risk of nonpayment in any way; and (3) whether any of the Florida Bar Rule factors set forth in Rowe are applicable, especially the amount involved, the results obtained, and the type of fee arrangement between the attorney and his client. Id. In the case of a multiplier, the permissible range is 1 to 2.5, which is determined as follows: "If the trial court determines that success was more likely than not at the outset, it may apply a multiplier of 1 to 1.5; if the trial court determines that the likelihood of success was approximately even at the outset, the trail judge may apply a multiplier of 1.5 to 2.0; and if the trial court determines that success was unlikely at the outset of the case, it may apply

a multiplier of 2.0 to 2.5." Id.[9]

Plaintiff asks that a contingency risk multiplier of 2.5 be applied to GT's fees.  For the following reasons the undersigned finds the circumstances of this case warrant application of a multiplier, but believe a multiplier of 2.2, rather than the 2.5 requested, is the more appropriate number by which to multiply the lodestar.

Application of a multiplier is not mandatory in contingency fee cases.  Alvarado v. Cassarino, 706 So.2d 380 (Fla. 2d DCA 1998).  In order to justify the use of a multiplier the movant must present evidence of the relevant factors, to wit, whether the relevant market requires a contingency fee multiplier to obtain competent counsel, whether the attorney was able to mitigate the risk of nonpayment in any way, and  whether any of the Florida Bar Rule factors enunciated in Rowe are applicable, especially the amount involved, the results obtained and the type of fee arrangement between the attorney and his client.  Quanstrom, 555 So.2d at 834.  GT has presented persuasive evidence in this regard.

In State Farm Fire & Cas. Co. v. Palma, 629 So. 2d 830, 833 (Fla. 1993), the Florida Supreme Court held that the application of a multiplier was appropriate in a case awarding fees under Fla. Stat. § 627.428.  In reaching its opinion, it noted that the purpose of Fla. Stat. § 627.428 is "to discourage the contesting of valid claims against insurance companies and to reimburse successful insureds for their attorneys' fees when they are compelled to defend or sue to enforce their insurance contracts." 629 So. 2d at 833 (quoting Insurance Co. of North America v. Lexow, 602 So. 2d 528, 531(Fla. 1992)). See

_____

[9]  In Rowe, the court allowed for a multiplier ranging from 1 to 3.0. Id. at 1151. The Quanstrom decision modified the Rowe multiplier by reducing the amount by which a fee may be multiplied from the 3.0 permitted in Rowe to 2.5. Quanstrom, 555 at So.2d 834.

also   Allstate Ins. Co. v. Regar, 942 So. 2d 969, 975 (Fla. 2d DCA 2006) ("[w]e also

conclude that the trial court properly determined that it had the discretion to award a

multiplier to the attorney's fees awarded under section 627.428"); Mercury Cas. Co. v.

Flores, 905 So. 2d 179, 180 (Fla. 3d DCA 2005) (holding that multipliers are authorized for

attorney fee awards under section 627.428, and stating "we conclude that . . . the use of

a multiplier in an uninsured motorist case is permissible"), rev. denied, 928 So. 2d 335 (Fla.

2006); United Automobile Ins. Co. v. Ricardo, 916 So. 2d 44, 44 (Fla. 3d DCA 2005) ("On

the record before us, we cannot conclude that the lower court abused its discretion when

it awarded the appellee a 2.0 multiplier on an attorney's fee award in the instant action for

a determination of coverage under a policy issued by the appellant insurer."); Holiday v.

Nationwide Mut. Fire Ins., 864 So. 2d 1215, 1217 (Fla. 5th DCA 2004) (holding that a

multiplier should have been applied to both the fees for the attorney who prosecuted the

suit as well as his co-counsel's fees when recovery was based on section 627.428), rev.

denied, Nationwide v. Holiday, 924 So. 2d 809 (Fla. 2005); Bluegrass Art Cast, Inc. v.

Consolidated Erection Services, Inc., 870 So. 2d 196, 197 (Fla. 5th DCA 2004) (affirming

a trial court's use of 2.2 contingency fee multiplier to fees awarded pursuant to Fla. Stat.

627.428, but also certifying the question to the Florida Supreme Court); Inacio v. State

Farm Fire & Cas. Co., 550 So. 2d 92, 97 (Fla. 1st DCA 1989)[10] (holding that the trial court

should have applied a contingency multiplier when calculating the amount of a reasonable

fee award against State Farm).

---

[10]  Disagreed with on other grounds by Sonara v. Star Cas. Ins. Co., 603 So. 2d 661, 663 (Fla.
3d DCA 1992), and Miller v. Transflorida Bank, 656 So. 2d 1364, 1368 (Fla. 4th DCA
1995).

"A primary rationale for the contingency risk multiplier is to provide access to competent counsel for those who could not otherwise afford it."  See Bell v. U.S.B. Acquisition Co., Inc., 734 So. 2d 403, 411 (Fla. 1999). Vantage View has provided ample evidence that it could not afford to pay its attorneys to represent it in this action on an hourly basis, that the relevant market required a contingency fee multiplier to obtain competent counsel, and that GT was not able to mitigate the risk of nonpayment in any way.  In addition, Vantage View provided evidence that: (1) the time and labor involved in preparing this case for trial was great; (2) this case required very skilled lawyers to achieve a positive result for Vantage View in light of the facts and the defenses raised by QBE; (3) the representation of Vantage View required the majority of the time of the GT lawyers who worked on it from June, 2008 through September, 2008, and precluded them from taking on other matters; (4) the results obtained by Vantage View are substantial in that Vantage View was awarded a net recovery of over a million dollars in damages despite its uphill battle; (5) GT worked under strict time limitations as the trial was scheduled to begin three months after it entered its notice of appearance in this matter and GT's motion to continue the trial was denied; and (6) the experience, reputation and abilities of the  attorneys who worked on this case are of the highest caliber, and (7) GT's fee agreement was entirely contingent upon Vantage View prevailing and GT had no right to payment in the event of a defense verdict.  Moreover, Vantage View has established that success was unlikely given the egregious errors contained in the estimate upon which Vantage View's sworn proof of loss was based, the fact that Vantage View did not grant QBE's request to submit to examinations under oath, and the numerous other defenses raised by QBE, several of

which, if successful, would have resulted in a defense verdict.

Based upon the above and foregoing, the Court finds a contingency multiplier is appropriate in this case and that the appropriate number by which to multiply the lodestar is 2.2 in that Plaintiff's success in this case was unlikely.    Accordingly, applying a 2.2 contingency multiplier to GT's lodestar of $780,818.10, results in an adjusted attorney's fee award of $1,717,799.82 for the work performed by GT's attorneys and paralegals.

As an additional defense to recovery of the full amount of Plaintiff's attorney's fees, Defendant raises Fla. Stat. §627.428, which provides that an insured is entitled to receive all of its attorney's fees only when it obtains a judgment greater than any settlement offer made by the insurer.  Danis Industries Corp. v. Ground Improvement Techniques, Inc., 645 So.2d 420, 421 (Fla. 1994).  The judgment for purposes of determining this issue includes the insured's damages plus any attorney's fees, taxable costs, and prejudgment interest incurred before the insurer's offer.  State Farm Mutual Automobile Ins. Co. v. Nichols, 932 So.2d 1067, 1074 (Fla. 2006).  Should the insured not obtain a judgment which exceeds 100% of the insurer's offer, it is then resultantly only entitled to "pre-offer fees under section 627.428." Nichols, 932 So.2d at1075.  "The insured having turned down the full amount it is owed, cannot claim the protection of section 627.48." Id. at 1074.  An insurer "cannot avoid attorneys fees by making a belated offer of its insurance coverage or any amount which would be less than the insured or beneficiary could recover in a final judgment as of the date of the offer."  Danis Industries Corp., 645 So.2d at 421.

As Plaintiff correctly observes, none of the cases cited by QBE involve a situation where the offer made by the insurer includes not only the insured's damages sought in the

pending lawsuit, but also any damages the insured could recover in any bad faith claim it intends to bring against the insurer.  Where, as here, an insured's damages, attorney's fees, taxable costs, and prejudgment interest incurred before the insurer's offer exceeds the settlement offered by the insurer, the insurer cannot avoid having to pay the full amount of attorney's fees awarded by the Court.  Id. QBE contends that the bad faith claim did not exist and therefore had no value on September 10, 2008, because the sixty day cure period provided for by Fla. Stat. §624.155(3)(d) had not yet expired.  That contention is without merit.  The statute merely provides that no action shall lie if the insurer actually pays the damages arising from its bad faith or corrects the circumstances giving rise to the bad faith statute.  It does not say that the cause of action doesn't exist until the sixty days have expired.  Id.  Since Vantage View's cause of action for bad faith was capable of being released in the event it settled with QBE and provided a full release to QBE, the Court finds that it existed on September 10, 2008 and had a value.

In the instant case, the value of Vantage View's claims and damages as of September 10, 2008 exceeded the amount of QBE's $2,000,000.00 settlement offer.  As of that date, Vantage View's claims and damages totaled $2,363,344.28 and were comprised of the damages awarded by the jury ($1,078,777.00), "lodestar" attorneys' fees ($900,707.40) without consideration of a multiplier, prejudgment interest ($59,495.29), taxable costs ($74,364.59), and Vantage View's bad faith claim ($250,000.00). (Pltf. Exs. 9, 11, 12, 13, 14).   Accordingly, Fla. Stat. §627.428 does not prevent Plaintiff from obtaining the full amount of attorney's fees due.

## B.  COSTS

As the prevailing party, Vantage View is entitled to an award of its taxable costs incurred in bringing this lawsuit.  Federal Rule of Civil Procedure 54(d)(1) states, in relevant part, that "costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs."  Fed. R. Civ. P. 54(d)(1).  Rule 54(d) creates a strong presumption in favor of awarding costs to a prevailing party.  Head v. Medford, 62 F.3d 351, 354-55 (11th Cir. 1995).  Indeed, costs "should be denied only as a penalty to the prevailing party for some defection on its part during the litigation."  Scelta v. Delicatessen Support Services, Inc., 203 F. Supp. 2d 1328, 1339 (M.D. Fla. 2002).  No such contention exists in this case.

28 U.S.C. §1920, delineating the costs a prevailing party is entitled to under Rule 54(d), provides that a prevailing party is entitled to:   (1) fees of the clerk and marshal; (2) fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case; (3) fees and disbursements for printing and witnesses; (4) fees for exemplification and copies of papers necessarily obtained for use in the case; (5) fees for §1923 docketing; and (6) fees for compensation of court-appointed experts, as well as fees and costs of interpreters and/or special interpretation services under §1828.

The Supreme Court has held that the provisions of 28 U.S.C. § 1920 define the full extent of a federal court's power to shift litigation costs absent express statutory authority to go further.  See Crawford Fitting Co. v. J.T. Gibbons, Inc., 428 U.S. 437 (1987); West Virginia University Hospital, Inc. v. Casey, 499 U.S. 83 (1991).  See also U.S. EEOC v. W & O, Inc, 213 F.3d 600, 620 (11th Cir. 2000).  Although the burden is on the party contesting a cost award, this burden presupposes that the requesting party has adequately

demonstrated with supporting documentation that such costs were indeed incurred. See Lee v. Am. Eagle Airlines, 93 F.Supp.2d 1322, 1336 (S.D. Fla. 2000)(refusing to tax costs that were not described in sufficient detail). The court has broad discretion in determining what costs are taxable, and will not be reversed on appeal absent abuse of discretion. Cochran v. E. I. Dupont de Nemours, 933 F.2d 1533 (11th Cir. 1991), cert. denied, U.S. 112 S. Ct. 881, 116 L. Ed. 2d. 785 (1992).

Vantage View seeks a total cost award of $102,655.10 for taxable costs it claims were necessary to its prosecution of the case, and includes costs for photocopy charges, off-site printing and copying charges, deposition and trial transcripts, court reporter fees, service company charges, subpoenas, witness fees, the filing fee and the courtroom technology fees. QBE takes issue with only two categories of the sought-after costs: courtroom technology fees and certain photocopy costs.[11] Each of these objections shall be addressed in turn.

Plaintiff seeks $17,985.00 for its use of a "computer technologist" at trial. The Court agrees with QBE that the use of a "courtroom technologist" does not fall within any of the categories of allowable expenses under Costs not specifically enumerated are not recoverable. For instance, costs incurred in mailing and sending documents by mail; express mail; facsimiles; travel expenses; and expert witness fees are not recoverable.

---

[11]   Initially there were two other categories of costs  QBE objected to, namely the amount of the private process server fees that exceeded the rate charged by the United States Marshall's Service, and the amount spent on multiple copies of deposition transcripts, mini-transcripts, and expedited handling charges. See Def's Resp., p.3 (D.E. 150).  These issues have since been resolved by the parties, however, with Plaintiff reducing the amount sought for these categories of expenses, resulting in Plaintiff's current request for $102,655.10 in total costs, rather than the $107,542.00, initially sought. See Pltff's Rep. in Supp. of its Mtn. to Tax Costs, p.2 (D.E. 157).

See Tang How v Edward J. Gerris, Inc., 756 F. Supp. 1540, 1545 (S.D. Fla. 1991), aff'd, 961 F.2d 174 (11th Cir. 1992). Additionally, "general copying, computerized legal research, postage (and) courthouse parking fees…are clearly not recoverable." Duckworth v Whisenant, 97 F.3d 1393, 1399 (11th Cir. 1996). Likewise, costs incurred in enlarging exhibits are not recoverable. Charter Medical Corporation v Cardin, 127 F.R.D. 111, 114 ( D. Maryland 1989). The costs incurred for equipment rental and fees to a videographer for playback of video depositions at trial are not taxable costs. Morrison v Reichhold Chemicals, Inc., 97 F.3d 460,465 (11th Cir. 1996).

Plaintiff's citation to Loughan v. Firestone Tire & Rubber, Co., 749 F.2d 1519, 1526, n.2 (11th Cir. 1985) for the proposition that the rental of video equipment has been deemed taxable, is misplaced under the circumstances presented in this case. Loughan did not address the situation present here, where Plaintiff incurred costs for the rental of computer equipment for the projection of demonstrative aids and evidence even though the means to do so already existed in the trial courtroom. The subject courtroom was equipped with an ELMO, as well as a large-screen plasma monitor. These items were available to Plaintiff at no cost. Plaintiff's decision to utilize and pay an outside company for services that could have been rendered by the Court to Plaintiff for free, is what distinguishes this case from Loughan, rendering Loughan inapplicable to the facts herein.

Nor is this Court persuaded by Plaintiff's assertion, in its Reply Memorandum, that the extra equipment was necessary to "display computer-animated graphics designed to enable the jury to understand the damage done... ." (D.E. 157, pp.4-5). As Defendant correctly observes, such animations could have easily been presented by hooking up any

40

one of counsel's many laptops to the Court's large screen plasma monitor and running the desired file. Accordingly, the Court shall deduct from the final cost award, the $17,985.00 Plaintiff seeks to tax as costs for its use of a "computer technologist" at trial.

Vantage View spent a total of $49,622.82 on outside copying services and in-house copy costs for the copying of documents that Plaintiff claims were reasonably necessary to assist the Court in reaching a conclusion as well as copies of documents obtained and produced in discovery. Defendant objects to $30,182.42 of these costs claiming same to be "excessive, duplicitive and/or incurred due to the substitution of counsel. Specifically, Defendant objects to the three following sub-sets of copying costs: $1,472.70 in costs incurred in obtaining trial and hearing transcripts in an unrelated case (the "Chalfonte case"); all costs related to copies of deposition exhibits, or at a minimum, $3,004.65 of the total cost of this sub-set which was related to obtaining copies of deposition exhibits for its own witnesses; and, just over $25,000 in costs Defendant claims Plaintiff has failed to substantiate the necessity for in any of its pleadings, including Plaintiff's Reply and the supplemental supporting affidavits, exhibits and chart attached thereto (D.E. 157), which purport to evidence that the copies sought were necessarily obtained for use in the case.

To begin with, the Court finds that the copies of the hearing and trial transcripts GT obtained from another first party insurance case involving QBE, *(the "Chalfonte case")* were necessary for use in trial preparation for this case and should be taxed as costs. GT used the subject transcripts extensively to prepare for depositions of QBE's experts and corporate representative (which were the same witnesses in both cases), and to prepare cross-examinations of those witnesses for use at trial. (Pltf. Ex. 6, ¶9) (1/13/10 Tr. 158:11-

159:4).

As for Plaintiff's request for all costs incurred in connection with receiving copies of deposition exhibits, the Court finds that except for the costs related to obtaining copies of deposition exhibits already in the possession of Plaintiff, these costs should be allowed. The cost related to obtaining copies of deposition exhibits is taxable where the exhibits are "essential to understanding an issue in the case." See Bell v. Columbia St. Mary's Inc., 2009 U.S. Dist. LEXIS 33162 (E.D. Wis. Apr. 8, 2009)(citing Harkins v. Riverboat Servs., 286 F.Supp.2d 976, 979 (N.D. Ill. 1998)).  According to the affidavit of Ms. Duff, these copies were necessary to "keep[] track of the documents each witness was questioned on during the depositions, for trial preparation, and in preparation for the deposition of other witnesses."  This is sufficient for purposes of establishing necessity. Where the subject documents are already in the possession of the moving party, however, costs related to obtaining copies of same are not recoverable. Cengr v. Fusibond Piping Sys., 135 F.3d 445, 456 (7th Cir. 1988)(rejecting request to tax costs for copies of deposition exhibits already in the possession of the prevailing party). Accordingly, the Court deducts from the cost award the $3,004.65 sought for copies of deposition exhibits for its own witnesses.

Finally, the Court finds no cause to deduct the approximately $25,000 in costs Defendant claims Plaintiff has failed to substantiate the necessity for.  As Defendant notes in its Sur-Reply(D.E 162, p.1), in response to Defendant's objections relating to costs, Plaintiff has filed, along with its Reply (D.E. 157), supplemental supporting affidavits, exhibits and a chart attached thereto, which purports to evidence  that the copies sought were necessarily obtained for use in the case. These supplemental supporting affidavits,

exhibits and accompanying chart, all substantiate Plaintiff's assertion that the copy costs sought are for copies of documents necessarily obtained for use in the case. Defendant's claim that the description provided is too general in nature, is rejected.

In accordance with the above and foregoing, the Court finds that of the $102,655.10 Plaintiff seeks in costs, the following costs should be deducted: $17,985.00 sought by Plaintiff for its use of a "computer technologist" at trial; and $3,004.65 sought for copies of deposition exhibits for its own witnesses. The Court finds the remainder of the costs sought reasonable, appropriate and necessarily obtained for purposes of the case. As such, the Court recommends the remainder of the costs sought be awarded. Thus, should the District Court elect to adopt the within Report and Recommendation as it relates to Plaintiff's request for an award of costs, Plaintiff would recover $81,665.45 in costs.

In accordance with the above and foregoing, it is hereby

**RECOMMENDED** that Vantage View's Motion for Attorney's Fees and to Tax Costs (D.E. #141) and Vantage View's Motion for Bill of Costs (D.E. #142) be **GRANTED** in accordance with the terms of the within Report and Recommendation. Accordingly, if the within Report and Recommendation is adopted, Vantage View should be awarded $1,871,779.82 in attorney's fees ($153,980.00 for the Garfinkel law firm and $1,717,799.82 for the GT law firm (obtained by applying a 2.2 contingency fee mulitplier to GT's lodestar amount of $780,818.10)) and $81,665.45 in costs, for a total attorney's fee and cost award of $1,953,445.27.

The parties have fourteen (14) days from the date of this Report and Recommendation within which to serve and file written objections, if any, with the

Honorable Kenneth A. Marra, United States District Judge. Failure to file objections timely shall bar the parties from attacking on appeal the factual findings contained herein. LoConte v. Dugger, 847 F.2d 745 (11th Cir. 1988), cert denied, 488 U.S. 958 (1988); RTC v. Hallmark Builders, Inc., 996 F.2d 1144, 1149 (11th Cir. 1993).

**RESPECTFULLY SUBMITTED** in Chambers at West Palm Beach, Florida, on May 24, 2010.

LINNEA R. JOHNSON
UNITED STATES MAGISTRATE JUDGE

cc:   Honorable Kenneth A. Marra
       All Counsel of Record

44